SIDEWINDER MARINE, INC., a
California Corporation, Plaintiff,

v.

STARBUCK KUSTOM BOATS AND
PRODUCTS, INC., a Colorado
Corporation, Defendant.

Civ. A. No. C–4864.

United States District Court,
D. Colorado.

Aug. 18, 1976.

Richard L. Schrepferman, Holme, Roberts & Owen, Denver, Colo., and George C. Limbach, Limbach, Limbach & Sutton, San Francisco, Cal., for plaintiff.

C. B. Messenger, Denver, Colo., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

MATSCH, District Judge.

This is an action for claimed infringement of U.S. Design Patent 219,118, issued on November 3, 1970 for a term of fourteen years to Ken R. Baker and Ronald Plecia. The claim of the patent is for the ornamental design for a boat as shown in five line drawings from different perspectives, presenting the outline of the boat, without detail.

The application for this patent was filed on October 17, 1969. At that time, Mr. Baker was the president of Shasta Fiberglass Co., a boat manufacturer, and he was also president of Sidewinder Marine, Inc., a boat sales company. Mr. Plecia was an industrial designer who had worked with Mr. Baker for several years in the development of racing and sport boats. Baker and Plecia assigned their entire interest in the patent application to Sidewinder Marine, Inc., and that assignment was recorded with the Patent Office on October 17, 1969.

Mr. Baker's experience and the business of Sidewinder and Shasta concerned high performance boats for racing and water skiing. They were not engaged in the production or sale of family pleasure boats before 1970.

In October, 1969, Mr. Baker sent a prototype of a boat called "Super Sidewinder 16" to the Chicago Boat Show, where it was well received. The primary significance of the Super Sidewinder 16 was that it combined the readily apparent features of a high performance speed boat with such safety features as raised gunwales and a deep V hull.

Among those attending the Chicago Boat Show was Robert R. Hammond, president of Glastron Boat Company of Austin, Texas, one of the largest makers of pleasure power boats in the United States. Mr. Hammond commented to Mr. Baker upon the similarity of the Super Sidewinder with a boat which Glastron was preparing to market. Mr. Hammond followed this conversation with a letter, dated October 6, 1969, forwarding four photographs of a full sized mock-up which he said had been finished four or five months before, and Mr. Hammond ended his letter with these words: "Now don't go say we've been copying!"

A few days after the Chicago Boat Show, Richard Schuster of Schuster Boats, Inc. purchased a Super Sidewinder 16, and Schuster Boats proceeded to make a prototype by physically copying the Super Sidewinder boat. Other companies soon began to develop boats very similar to the Super Sidewinder.

Because of a concern for this copying, Sidewinder Marine, Inc. filed with the Patent Office a "petition to make special", seeking to expedite consideration of its patent application because of claimed infringement by these other companies. Under applicable regulations, that procedure re-

quired the applicant to submit copies of references deemed most clearly related to the subject matter of the claim. Patent and Trademark Office, *Manual of Patent Examining Procedure,* § 708.02, VII.(d) (3d ed. 1961), with revisions.

The prior art references submitted by Sidewinder Marine, Inc. are in evidence here as plaintiff's exhibit 28. They consist of three prior design patents for boats bearing no resemblance to the Super Sidewinder, a sales brochure with the Sidewinder and other boats, and another sales brochure for a boat called the Nova which somewhat resembled the Super Sidewinder.

Perhaps the most eye catching feature of the Super Sidewinder is a low windshield which curves into the raised gunwales and an extension of the same angle downward to the aft of the boat in a continuous line, pleasing to the sense of perspective. That particular feature appears to be the most discernible difference between this boat and those previously made by Sidewinder as well as many other manufacturers. The evidence in this case includes many pictures and illustrations in magazines and other publications showing boats with sleek pointed bows, decks which are quite comparable and an overall low profile.

It is clear from the evidence that Glastron developed the kind of deep V hull used in the Super Sidewinder and that this hull design was in the public domain for several years before 1969.

The evidence indicates that there is significant unity of design in automobiles and pleasure boats. The wraparound windshield was used in automobile design long before this subject patent application.

The lateral aspect of the subject design patent as shown in Figure 2 has a similarity to the lines used by a cabin cruiser manufacturer to identify it in advertising and boating publications as early as 1965.

Glastron did make and market its similar boat in 1970. In October, 1970, counsel for Sidewinder Marine, Inc. sent notices to Glastron and others to inform them that the design patent would issue in November,

1970, that their boats were considered to infringe and to offer license agreements. Subsequently, Mr. Baker notified Mr. Hammond that Sidewinder did not claim the Glastron boat to be infringing.

An infringement suit was filed by Sidewinder Marine, Inc. in the Central District of California against Robert Burns, doing business as Cheetah Boat Manufacturing Co., and on October 31, 1972, that court entered its findings and conclusions determining the patent to be valid and infringed. *Sidewinder Marine, Inc. v. Burns,* 176 U.S. P.Q. 499 (D.C.C.D.Cal.1972).

The Cheetah boat and two of the defendant's boats are sufficiently similar that both would be subject to the same analysis on the question of infringement. However, the question of the validity of the patent must be examined in light of the evidence of prior art before me. There is no evidence in the record which would indicate that the prior art introduced as evidence in this action is coextensive with that which was before the California court. Indeed, in light of the vigorous defense and voluminous prior art introduced by defendant Starbuck, I must assume that some of the prior art before me was not before the California court. More importantly, it is well settled that a different defendant in a subsequent infringement action may raise the defense of patent invalidity anew; there is no *res judicata* or collateral estoppel effect to the previous finding of patent validity in the California action. *Johns-Mansville Corp. v. Cement Asbestos Products Co.,* 428 F.2d 1381 (5th Cir. 1970), and cases cited therein; 7 Deller's *Walker on Patents* 11, § 469 (2d ed. 1964).

Because the line drawings in the patent claim are so simplified, it is somewhat difficult to compare those figures with the photographs of the boats in evidence. Indeed, it does not appear that the Super Sidewinder boats actually made are the same as these drawings. Particularly, there are substantial differences in the hull area and Figure 5 bears little resemblance to the posterior aspect reflected in plaintiff's exhibit 76.

The perspective drawings themselves contain such meager detail, particularly in the area of surface shading necessary to emphasize contour, that they barely seem to satisfy the Patent Office's rules relating to design patent applications.[1] Most of the design patents introduced as prior art references contain more detailed drawings. Furthermore, since the drawings do not contain any dotted lines, the design patent claim must be considered to be for the overall appearance of the entire boat, that is, the combined appearance of the assertedly new deck with the old deep V hull, acknowledged to have been in the public domain before 1969. If the hull had been intended as a merely environmental, functional structure, it should have been drawn in dotted lines.[2] The claim itself was of "the ornamental design for a boat, as shown," making no separate reference to the deck or hull.

The manufacture and marketing of pleasure boats in the United States is a business in which there is so much similarity in design and where copying is so common that one of the largest companies, Glastron Company, makes no effort to attempt to protect its designs through patents.

Sidewinder Marine, Inc. and Shasta Fiberglass experienced financial difficulties in 1972 and new capital was acquired through financing obtained from a group of investors led by Saul Davidson. These investors put new management into the company and the patent rights became a part of the collateral securing the investment. These companies became debtors in consolidated proceedings under Chapter XI of the Bankruptcy Act in the Northern District of California.

During the course of this patent litigation, all questions concerning title and claims of interest in the subject patent and cause of action for infringement were submitted to the bankruptcy court in appropriate pleadings and that court has entered orders authorizing the prosecution of this lawsuit by the debtor and its counsel for and on behalf of all claimants.

■ While the defendant has strenuously objected to jurisdiction here because of the complexity and confusion surrounding the chain of title in the subject patent, the effect of the orders entered in the bankruptcy proceedings in the Northern District of California is that the plaintiff here has acted for and on behalf of all who could conceivably have any right, title or interest in the patent, the claim and the cause of action. All such persons are, accordingly, bound by the result herein and this court does have jurisdiction to determine the questions of validity of the patent and the charge of infringement pursuant to statute.

■ The line drawings claimed to constitute an overall boat design subject to patent protection in this case failed to meet the constitutional requirement of invention reflected in the Section 103 nonobviousness condition for patentability. 35 U.S.C. § 103. Article I, Section 8, Clause 8 of the Constitution grants Congress the power "[t]o promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." In exercise of that power, Congress enacted Title 35 of the United States Code specifying the procedure and requirements for obtaining a patent. Section 171 of Title 35,

---

1. *Manual of Patent Examining Procedure, supra,* § 1503.02, states, *inter alia*: "The drawing figures should be appropriately surface shaded to show character or contour of the surface represented. This is of particular importance in the showing of three dimensional articles where it is necessary to clearly delineate plane, concave, convex, raised and depressed surfaces of the article and distinguish between open and closed areas thereof." *See also,* Toulmin, *Handbook of Patents,* § 157, at 122 (2d ed. 1954).

2. *Manual of Patent Examining Procedure, supra,* § 1503.02: "The ornamental design which is being claimed must be shown in solid lines in the drawing. . . . The drawing disclosure should make clear the article on which design patent protection is sought. Environmental structure may be shown only in broken lines, where necessary, . . . . The specification should make it clear that the structure shown in broken lines is not part of the design sought to be patented."

providing specifically for design patents, states:

> Whoever invents any new, original and ornamental design for an article of manufacture may obtain a patent therefor, subject to the conditions and requirements of this title.

> The provisions of this title relating to patents for inventions shall apply to patents for designs, except as otherwise provided.

Thus, the statutory language enabling the procurement of design patents unequivocally applies all of the requirements for patentability enumerated in Title 35 to design patents, absent explicit exception therefrom.

There is no statutory exception for design patents to the nonobviousness requirements of Section 103, which states:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which the subject matter pertains.

That section, enacted as part of the 1952 amendments to the Patent Act, simply codified previous case law embodying the constitutional standard of invention. See *Dann v. Johnston*, 425 U.S. 219, 226, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976); *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 279, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966).

The Tenth Circuit has recently enumerated the points to be considered on the question of nonobviousness:

> [T]he scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art must be resolved. *Graham v. John Deere Co.*, . . . . . . The trial court's findings on these points as to obviousness involve fact

questions. *Moore v. Shultz*, 491 F.2d 294, 300 (10th Cir.), *cert. denied*, 419 U.S. 930, 95 S.Ct. 203, 42 L.Ed.2d 161. . . .

*CMI Corp. v. Metropolitan Enterprises, Inc.*, 534 F.2d 874, 880 (10th Cir. 1976). The Supreme Court, in *Graham v. John Deere Co., supra*, 383 U.S. at pp. 17–18, 86 S.Ct. at p. 694, clearly labeled as secondary considerations such factors as "commercial success, long-felt but unsolved needs, failure of others, etc."

The circuits have disagreed, however, on the application of the nonobviousness test in the area of design patents. The Ninth Circuit in *Schwinn Bicycle Co. v. Goodyear Tire & Rubber Co.*, 444 F.2d 295 (9th Cir. 1970), has adopted the view of the Court of Customs and Patent Appeals, stated in *In re Laverne*, 53 CCPA 1158, 356 F.2d 1003, 1006 (1966), that under Section 103 it is only necessary "to determine obviousness to the ordinary intelligent man." The Third, District of Columbia and Second Circuits, however, have rejected the *Laverne* rationale and required that nonobviousness be measured from the perspective of a designer having ordinary skill in the art. *Hadco Products, Inc. v. Walter Kidde & Co.*, 462 F.2d 1265 (3rd Cir. 1972), *cert. denied*, 409 U.S. 1023, 93 S.Ct. 464, 34 L.Ed.2d 315; *Fields v. Schuyler*, 153 U.S.App.D.C. 229, 472 F.2d 1304 (1972), *cert. denied*, 411 U.S. 987, 93 S.Ct. 2270, 36 L.Ed.2d 965; *G. B. Lewis Co. v. Gould Products, Inc.*, 436 F.2d 1176 (2d Cir. 1971).

■ I agree with the position of the Second, Third and District of Columbia Circuits requiring nonobviousness to be measured in light of the prior art at the time of the invention from the perspective of a designer of ordinary skill. Such an approach is in accord with the clear language of Section 103, and observes the mandate of Section 171 making all provisions of Title 35 applicable to design patents absent express statutory exception. The standard of nonobviousness to the ordinary designer is consistent both with the statutory scheme in Title 35 and the constitutional requirement of invention as the *quid pro quo* for the grant of a patent. Any lesser standard

would unduly extend monopolies in designs and restrict competition without an offsetting inventive contribution by the patentee. However, I find that plaintiff's design fails to meet the nonobviousness requirements of Section 103 under either the "ordinary intelligent man" or "ordinary designer" standards.

■ The courts have found difficulty articulating the differences between the two standards of nonobviousness, particularly because of the acknowledged subjectivity which pervades the perception of design patents. Unlike the detailed analysis applied to mechanical, chemical or process patents, the examination of design patents is limited to their overall appearance. *See Gorham Co. v. White,* 81 U.S. 511, 525, 20 L.Ed. 731 (1871); 2 Deller's *Walker on Patents, supra,* 734–35, § 158, and cases cited therein.

The amorphous nature of design patents is further evidenced by the Patent Office's limitation of claims for design patents to "the ornamental design for the article (as shown)." *Manual of Patent Examining Procedure, supra,* § 1503.01, Rule 153(a). The content of a design patent grant is, therefore, extremely elusive:

> Design patents being without claims, the [Patent] Office never really declares of what combination of elements the monopoly consists; and the grant really amounts to no more than saying that the patent lurks somewhere among the possible combinations which will fit upon the disclosure.

*Rowley v. Tresenberg,* 123 F.2d 844, 844–45 (2d Cir. 1941); *see also,* 4 Deller's *Walker on Patents, supra,* 154, § 254. Indeed, the Supreme Court has noted the unique character of design patents: "To speak of the invention as a combination or process, or to treat it as such, is to overlook its peculiarities." *Gorham Company v. White, supra,* 81 U.S. at 525, 20 L.Ed. 731. Yet the fact remains that design patents must conform to Title 35 requirements, and the Supreme Court has more recently emphasized the necessity strictly to observe the criteria for nonobviousness determinations to insure

"that uniformity and definiteness which Congress called for in the 1952 Act." *Graham v. John Deere Co., supra,* 383 U.S. at 18, 86 S.Ct. at 694.

In determining the nonobviousness *vel non* of design patents, uniformity in applying the Section 103 standard can best be achieved if the relevant field of prior art is clearly delineated. The differences between the "ordinary designer" and "ordinary intelligent man" tests can, therefore, be understood by distinguishing the areas of references which should be considered as prior art under each test.

In applying the "ordinary designer" standard to this case, I would include as prior art references previous design developments in both the boating and automotive fields, since there is credible testimony that a boat designer of ordinary skill would be aware of such developments. In applying the "ordinary intelligent man" test, I would limit prior art references to boat designs, since there is no reason to expect a layman to make subtle comparisons between boat decks and the upper body designs of automobiles. I believe the better approach to be the "ordinary designer" test, but since neither the Supreme Court nor the Tenth Circuit has ruled upon which test should be applied, I have carefully analyzed the prior art references in evidence under both standards of nonobviousness.

■ The plaintiff's design would have been obvious to an "ordinary intelligent man" at the time of its creation because the assertedly innovative features of plaintiff's design already existed in the low profile decks and sleek pointed bows of boats shown several years prior to 1969 in numerous boating magazine articles and advertisements. While it is true that many of those were racing boats, the design features were so similar as to render plaintiff's improvements obvious. The application of existing design lines from speed boats to family pleasure boats is not an invention warranting a design patent. Plaintiff's development is more accurately described as placing a somewhat modified existing design in a slightly different setting, and

230

there is certainly no design patent protection for a new functional application of an existing design. While the emergence of family pleasure boats with racing boat lines met with much acclaim in the boating industry, such marketing insight is not the kind of promotion of "the Progress of Science and the useful Arts" meriting the grant of a patent. It must be remembered that commercial success and widespread copying of the design are only secondary indicators of nonobviousness which cannot elevate a design deemed obvious by reference to the prior art.

Specific examples of prior art references incorporating the basic features of plaintiff's design include the following: 1) Chrysler 75 & Chrysler Mustang, appearing in an illustrated article in *Boating News,* February, 1966, pp. 18–19 (defendant's exhibit C3); 2) MerCruiser, appearing in an illustrated advertisement in *Boating News,* April, 1966, p. 8 (defendant's exhibit D3); 3) Rayson-Craft, appearing in an illustrated advertisement in *Hot Boat Quarterly,* Summer, 1966, p. 7 (defendant's exhibit Y2).

The design feature of a low windshield curving into raised gunwales and extending in a' continuous downward line toward the aft of the boat is substantially similar to the design of the advertising illustration used consistently by Campbell Boats to identify its products for several years prior to 1969. That advertising illustration appears in at least six separate issues of *Boating News* from December, 1965 through September, 1966 (defendant's exhibits A3 through E3), and also in *Hot Boat* magazine, May, 1967, p. 49 (defendant's exhibit F3).

The Campbell Boats advertising illustration bears a strong resemblance to Figure 2 of plaintiff's design patent claim. The Rayson-Craft advertisement is substantially similar to plaintiff's Figures 1 and 3. Some of the prior art references vary significant-

ly in appearance and there is some combining of their different features in making these comparisons. However, the necessity to draw on diverse references arises in large part from the imprecision of plaintiff's own drawings.[3] The five figures showing different perspectives in plaintiff's design patent claim (plaintiff's exhibit 1) are inconsistent in their sense of proportion, resulting in a confusing semblance of more than one design in the sum of the perspectives.

The relevant field of prior art references to be applied under the "ordinary designer" standard of nonobviousness would necessarily include all of the above-mentioned references in the boating magazines readily available to the "ordinary intelligent man". Additionally, there are striking resemblances between plaintiff's design and certain upper body automobile designs which should be considered as references to the "ordinary designer". The strongest of such references is the Cyrolac Research Vehicle (CRV), whose design was published in a 1965 pamphlet of the Marbon Chemical Division of Borg-Warner Corporation (defendant's exhibit Q3), and which was also discussed and illustrated in a January, 1966 article in *Industrial Design* magazine (defendant's exhibit O3). The Dupont amphibious car (defendant's exhibit I3), while not substantially similar to plaintiff's design, is indicative of the interchangeability and cross-referencing of design developments in the automotive and powerboat industries. Given such cross-referencing by designers of ordinary skill, the obviousness of plaintiff's design becomes even clearer.

Naturally, the "ordinary designer" standard for nonobviousness requires a greater degree of invention than the "ordinary intelligent man" test. However, the prior art references discussed above demonstrate that plaintiff's design fails to meet the conditions for patentability established by 35 U.S.C. § 103 because, whichever standard is applied, the differences between plaintiff's

---

**3.** The drawings do not conform to the standards of precision generally required by the Patent Office: "The drawings must be prepared with great care to show the design being patented exactly. All proportions and relative arrangement of parts must be exactly reproduced in the drawings. All views must be in strict agreement." Toulmin, *Handbook of Patents,* § 157, at 122 (2d ed. 1954).

design and the prior art are such that the design as a whole would have been obvious within the meaning of that section.

While the evidence does show that a man named Ferguson left Glastron and became employed by Sidewinder in 1969, there is no adequate basis for drawing an inference that the plaintiff obtained this design from that company. What is a fair inference is that both companies simultaneously arrived at the design of their very comparable boats. Such simultaneous development of very similar designs by Glastron and Sidewinder strongly supports the conclusion that the design was obvious at the time of its creation. This is not a case in which the most relevant prior art was in other design patents; it was and is in the public domain.

■ The Section 171 requirement that a design be "new" is the equivalent of the novelty requirements of Section 102. 2 Deller's *Walker on Patents, supra,* 746, § 159. To find a lack of novelty, it is necessary that a prior single reference fully discloses the patent claims in issue. *See In Re Foster,* 52 CCPA 1808, 343 F.2d 980 (1965). As applied to design patents, it would be necessary to find that the overall appearance of a prior reference was virtually identical to plaintiff's design. Such a finding cannot be made on this record, and therefore plaintiff's design must be deemed to satisfy the Section 102 novelty conditions for patentability. Since there is no adequate basis for determining that Baker and Plecia did not develop the subject design, and plaintiff has never abandoned the patent, none of the conditions in Section 102 present a bar to the patentability of plaintiff's design.

■ While the Section 171 requirement that a design be "original" overlaps with and incorporates part of the Section 103 nonobviousness criteria discussed above, it is to some extent a superimposed condition for patentability applied to design patents because of the unique emphasis upon their overall appearance. A design might be original in overall appearance in the sense of giving a new and pleasing aesthetic effect, but still be obvious by reference to the prior art. *See Hadco Products, Inc. v. Walter Kidde & Co., supra.* I find that many of the prior references in evidence are so substantially similar to plaintiff's design that it lacks the originality required under Section 171.

In summary, plaintiff's design does satisfy the novelty and other requirements of Section 102. The design, however, is not "original" within the meaning of Section 171. Most importantly, the design does not meet the nonobviousness conditions for patentability of Section 103, and therefore lacks the invention necessary for a patent. Therefore, plaintiff's U.S. Design Patent 219,118 must be, and hereby is, declared invalid.

In light of the conclusion that plaintiff's patent is invalid, the question of infringement becomes moot; an invalid patent cannot be infringed. 7 Deller's *Walker on Patents, supra,* 425 *et seq.,* § 588, and cases cited therein. The claims for infringement must therefore be dismissed.

■ While 35 U.S.C. § 285 provides that "the court in exceptional cases may award reasonable attorney fees to the prevailing party," I find that attorney fees are not justified in this case because the infringement suit was brought in good faith and with a prior finding of validity in another action.

Defendant had asserted as a defense to the infringement claim that plaintiff was estopped from enforcing the patent due to its unwarranted extension of the patent monopoly and unfair competition in connection therewith, which acts were also asserted to be the basis of a counterclaim alleging antitrust violations under the Clayton and Sherman Acts. The evidence concerning such alleged conduct is insufficient to give merit to either the defense or the counterclaim. Defendant's counterclaim should therefore be dismissed.

Upon the foregoing findings of fact and conclusions of law, it is hereby

ORDERED that plaintiff's U.S. Design Patent 219,118 is declared invalid, and it is

FURTHER ORDERED that the clerk shall dismiss the complaint for infringe-

ment and shall enter judgment thereon for the defendant, and it is

FURTHER ORDERED that the clerk shall dismiss defendant's counterclaim and enter judgment thereon for the plaintiff, and it is

FURTHER ORDERED that no attorney fees shall be awarded and no costs shall be taxed on either the complaint or the counterclaim, and it is

FURTHER ORDERED that this civil action is dismissed.