DEERE & COMPANY, Plaintiff-Appellee and Cross-Appellant,

v.

HESSTON CORPORATION, Defendant-Appellant and Cross-Appellee.

Nos. 77–1561, 77–1562.

United States Court of Appeals, Tenth Circuit.

Argued Nov. 16, 1978.

Decided March 9, 1979.

Dugald S. McDougall, Chicago, Ill. (Dennis McCarthy and Rand L. Cook, Salt Lake City, Utah, and Theodore R. Scott, Chicago, Ill., on brief), for plaintiff-appellee and cross-appellant.

Gordon D. Schmidt, of Schmidt, Johnson, Hovey & Williams, Kansas City, Mo., for defendant-appellant and cross-appellee.

Before HOLLOWAY and DOYLE, Circuit Judges, and STANLEY,* Senior District Judge.

WILLIAM E. DOYLE, Circuit Judge.

## I.

### THE PLEADINGS AND PROCEEDINGS

Plaintiff-appellee Deere & Company instituted this action in the United States District Court for the District of Utah. A declaratory judgment to declare certain patents invalid was prayed for against the Hesston Corporation of Hesston, Kansas, the owner of United States Patent No. 3,556,327, entitled "Loose Hay Wagon," issued January 19, 1971, and filed by Harold Keith Garrison April 14, 1969; also, United States Patent No. 3,728,849, entitled "Hay Loader," issued April 24, 1973, on application filed November 14, 1969, by Ezra Cordell Lundahl.

From further allegations in the complaint it appears that Deere has designed and built a hay wagon, has exhibited it and offered it for sale at meetings of farm implement dealers, and is now manufacturing and selling in competition with a hay wagon manufactured and sold by Hesston, named Stak-Hand.

* Of the District of Kansas, sitting by designation.

It is further alleged that Hesston notified Deere that it considered the Deere implement to have infringed on both the Garrison and Lundahl Patents. Deere maintains in furtherance of its complaint that the Garrison and Lundahl Patents are invalid and so not infringed; also, it maintains that the Garrison and Lundahl Patents were obtained through fraud on the Patent Office and that they are invalid because of the sale of a prototype of the hay loader in the Lundahl Patent.

The answer on behalf of the defendant-appellant denies the allegations as to the invalidity, fraud and prior sale of a prototype and contains a counterclaim alleging infringement. A supplemental counterclaim lists a series of Hesston Patents. These include those mentioned above together with improvement patents.[1]

Plaintiff-appellee Deere has filed a reply to the fourth supplemental counterclaim as a result of which all matters are fully in issue.

This matter was tried to the court before United States District Judge Anderson, District of Utah, who ruled all eight patents of Hesston Corporation invalid under 35 U.S.C. § 102(b) and 35 U.S.C. § 103. The district court essentially ruled that the patents in issue were invalid because they were obvious as provided in 35 U.S.C. § 103 and because they were known to the public for more than one year before the patent application under § 102(b).

The trial court said that the controversy centered around four patents: Lundahl Patent No. 3,728,849, a haystacking method; Lundahl Patent No. 3,828,535, a haystacking machine (Lundahl I Patent and Lundahl II Patent, respectively). The other two primarily involved are the Garrison Patent No. 3,556,327, a haystacking machine, and the Garrison Patent No. 3,847,072, a haystacking method (the Garrison I Patent and Garrison II Patent, respectively).

## II.

### HISTORY AND BACKGROUND

This controversy had its origins in 1960 and the years following.

The Lundahls, Cordell and Ezra, son and father respectively, were engaged in the manufacture of loose hay wagons. Cordell, the son, saw the need for a machine that would transform loose hay into closely packed haystacks which could either be left in the field or moved to a storage place.

· Lundahl's first machine was a simple wagon which compressed the hay. It was loaded by a machine known as a Farmhand grapple fork or a Farmhand. This latter was pulled by a tractor through the hay field where it would pick up loose hay and deposit it into the wagon. This wagon had high side walls and a front panel which moved toward the rear and in so doing compacted the hay against the rear doors. Lundahl discovered that this mechanism loaded the hay unevenly and without a uniform density. The result was disintegration of the hay stack. There were other deficiencies. The loading was a separate function; there was a lack of integrated method of pulling the wagon down the windrow. The operation was in two separate steps, in other words. After the loading there followed the horizontal compaction which was also in stages. Each time

1. The numbers, names and dates of issue are as follows:

| Number | Title | Patented |
|---|---|---|
| 3,556,327 | Loose Hay Wagon | January 19, 1971 |
| 3,728,849 | Hay Loader | April 24, 1973 |
| 3,757,687 | Press Mechanism for Stacking Implements | September 11, 1973 |
| 3,828,535 | Hay Loader | August 13, 1974 |

| Number | Title | Patented |
|---|---|---|
| 3,842,732 | Tailgate Control for Stackers | October 22, 1974 |
| 3,847,072 | Loose Hay Wagon | November 12, 1974 |
| 3,878,670 | Stack Forming Loader | April 22, 1975 |
| 3,899,966 | Machine for Loading, Stacking and Unloading Crops | August 19, 1975 |

some hay was loaded it had to be compressed and then more hay would be added and compressed until the wagon was filled. While producing one complete haystack, this process resulted in a stack which tended to separate and fall apart. To overcome this, Lundahl added vertical compression units consisting of two gate-like top presses which would be set as extensions of the side walls and would swing down from the top on hinges powered by hydraulic compressors. Notwithstanding this, though, the principal compression was the horizontal force created by compressing the crop against the back walls of the wagon.

In February 1966, Lundahl advertised in a farm journal a one-man automatic feeding system for long hay. While the advertisement said that the machine would stack and compress loose hay from the windrow into neat uniform stacks without any manual handling, at this time an integrated system had not been developed: The wagon still had to be loaded separately. One Warren DePuy purchased one of these incomplete machines. It lacked the attachment which would make the machine self-loading. This was promised at a later date. This is here referred to as the DePuy machine and it was put to use during the 1966 haying season and for part of the 1967 season, but had mechanical difficulties as a result of which DePuy sued the Lundahl Corporation for breach of warranty. After this the machine was abandoned by DePuy.

In 1966, the Hesston Corporation, defendant-appellant here, bought the assets of the Lundahl Corporation.[2] Hesston was very much interested in the stacking machine idea and pursued it through one of the engineers for Hesston, Keith Garrison, who worked with Cordell Lundahl on improving the design. Prior to this, Lundahl had come to the realization that vertical compaction was desirable. This led to the development of the swinging top-gates which came down on the loaded haywagon and also the addition of the tuckers to the undersides of the

hinged gates on the earlier prototype. So the research was pursued along the line of developing the vertical compaction. Testing along this line continued through 1968 with several prototypes, including a 1966–67 prototype which redesigned top-presser gates integrated with a crop pick-up and distribution system. Eventually Garrison came up with a method of continuous loading of hay into a moving wagon by using the blower duct system with a dispersal mechanism which served to spread the hay evenly. Garrison also discarded the two-gate approach and adopted a single unit, described as an inverted U, which was used to apply downward pressure. These innovations were said to have produced "real good" results which yielded stacks of uniform density and having a self-supporting nature. Also, the stacks were better shaped from the standpoint of shedding water. This machine was ultimately marketed.

Hesston, in the year 1969, commenced the production of the StakHand 60, which made six ton stacks. Some smaller editions or models were added later, such as the StakHand 30, for forming three ton stacks, and the StakHand 10, which produced a one ton stack. Improved models were identified with an "A" after the number.

Deere started selling machines which made one ton stacks, three ton stacks and six ton stacks, all of which appeared to be based on the same design as the Hesston machine. This activity produced the present controversy.

The application for patent on the Garrison I was filed in 1969. It matured January 19, 1971.

At the very outset the Garrison II Patent was rejected on the basis of prior art. The Patent Office ruled that Garrision II was the same as the Sutherland British Patent, the only difference being its blower conveyor. After this, Hesston offered an amendment claiming that it was not based on any prior art and saying that "it is absolutely

2. A brief description of the Hesston Corporation is set forth in Appendix I.

new to provide a hay gathering or collection feature in a press as its initial function in cooperation with the main crop receiving body." The Patent was finally issued August 13, 1974.

The Lundahl Patents I and II suffered somewhat the same fate. Lundahl I was filed in 1969 and rejected in 1972. The rejection was based on the prior issuance of Garrison I. Lundahl, by swearing back, established that he had completed his invention prior to the date the Garrison I Patent was filed. The application was accepted and the patent matured in 1973.

The Lundahl II, which was also based on the Garrison I, was rejected by the examiner. Again, this objection was overcome by swearing back, but ultimately some but not all of the claims were allowed.

These four described patents, together with four so-called minor patents, were all ruled invalid, and basically these rulings are the issues for consideration on this appeal.

III.

THE JUDGMENT OF THE TRIAL COURT

Judge Anderson's opinion, which is published in 456 F.Supp. 520 (D.Utah 1977), constitutes thorough and careful workmanship, and in writing this opinion we have made full use of it. The opinion considers the following issues:

A. Fraud on the Patent Office.
   The contention of plaintiff-appellee Deere that fraud was perpetrated on the Patent Office.
B. The patentability of the Garrison, Lundahl and improvement patents. Included was the nonobviousness under § 103, and prior sale or use under § 102(b).

Essentially the contention of fraud perpetrated on the Patent Office is predi-

cated on Hesston's failure to disclose in the application for the Garrison I and II Patents the prior art contained in the Lundahl prototype haystacking wagon which was merely mechanically improved by Lundahl originally, and also the failure to disclose in the Lundahl I and II proceedings the sale and development of the DePuy machine.

The trial court pointed out that under *McCullough Tool Co. v. Well Surveys, Inc.,* 343 F.2d 381, 394 (10th Cir. 1965), *cert. denied,* 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed. 2d 851 (1966), Deere had the burden of establishing the obtaining of the four main patents by the use of fraud. Here the form of the fraud was nondisclosure and it would have to appear that the Patent Office would have rejected the Hesston application but for the fraudulent nondisclosure. *See Norton v. Curtiss,* 433 F.2d 779, 795 (C.C.P. A.1970). The trial judge was not convinced that the Patent Office would have rejected the four major patents but for the nondisclosure, nor was the court able to conclude that there was any willful, intentional, wrongful or even reckless conduct in the failure to disclose. The court concluded as follows:

Based on the present state of the record, the court concludes that the evidence is insufficient to impute to Hesston and its attorneys a fraudulent intent or gross and reckless conduct that would justify a finding of patent invalidity due to a purported fraud on the Patent Office. Hesston and its attorneys exercised good faith judgment on whether to include the prior Lundahl wagons as prior art in the Lundahl I, II and Garrison I, II patent applications. That good faith judgment, based on a strict notion of the scope of the intended patent in reference to the prior art, though erroneous, will not render the patent invalid. The court, therefore, denies Deere a declaratory judgment that the four major patents in issue are invalid due to Hesston's alleged fraud on the Patent Office.

On the question of invalidity of the patent as having been unpatentable under the prior art, the trial court reviewed the history of the particular provision noting that prior to the Patent Act of 1952, the requirements were that the device was to be "new and useful." Cited was *Hotchkiss v. Greenwood*, 52 U.S. (11 How.) 248, 13 L.Ed. 683 (1851), where the Supreme Court in defining the term "new" stated that "to be patentable a device must demonstrate 'skill and ingenuity' beyond that possessed by 'the skillful mechanic.'"

The 1952 Act, the court pointed out, reenacted the "new and useful" formula of patentability in the form of the terms novelty and utility in place of the requirement of the invention test by introducing nonobviousness.

The trial court concluded that the standards for determining patentability of the Hesston's Patents were, then, utility, novelty and nonobviousness. The court also concluded that Deere had not seriously challenged the patents as not having utility.

## IV.

### WHETHER THE DETERMINATION BY THE TRIAL COURT THAT THE PATENTS FAIL FOR OBVIOUSNESS IS SUPPORTED BY THE FACTS AND THE LAW OF THE CASE [3]

The trial court relied on the case of *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Obviousness under § 103, it was said in *John Deere*, is to be determined in the light of the prior art by studying the differences between the prior art and the claims at issue and by resolving the level of ordinary skill in the pertinent art. Against this background the obviousness or nonobviousness of the subject matter is determined. The Court, in *John Deere*, said that "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented." 383 U.S. at 17–18, 86 S.Ct. at 694. These could not, however, substitute for lack of invention.

In subsequent cases the Supreme Court has continued to apply the *Graham v. John Deere* test of patentability under § 103. The more important of the Supreme Court cases on the subject are *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 280, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976), and *Dann v. Johnston*, 425 U.S. 219, 230, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976).

The court then goes on to consider the Hale, Isom and Sutherland Patents cited as prior art by Deere. Hale dates back to 1887 and describes a hay-cocking machine, the main function of which was to gather hay or other fodder up from a field and discharge the fodder to the ground in compact piles or cocks for protection against storms. It sounds familiar. The Hale claims 1 through 4 state that the machine gathered the hay from the ground, elevated it into an open bin, provided distribution reciprocating back and forth over the open top together with a hinged bottom to drop the hay "cock" on the ground.

The Isom Patent, which is dated in July 1918, describes a mechanical hay shocker which, in combination, comprised a hopper, delivery means discharging into the hopper, tamping members within the hopper, a draper forming the bottom of the hopper and a facility for stopping the delivery means. The tamping member operated, the doors opened, and the draper started in motion.

---

3. Appended to the opinion is a discussion of the operation of the Lundahl and Garrison machines. We hope that it will provide a better understanding of the functions of the patents in suit.

The Sutherland Patent described a harvesting machine which provided an improved construction and a method by which the hay can be compressed to form a stack and then deposited on the ground. This Sutherland Patent, dated in 1964, was the examiner's prior art reference for rejection of the Garrison II Patent application. This British patent was said by the trial court to clearly teach vertical compression of the hay to form a stack. Sutherland had a wheeled trailer attached to a tractor with a compression chamber mounted on the trailer into which hay could be "charged," the chamber being open at the top and having a rear wall which could be opened, and a hydraulically operated compression member by which the hay introduced into the chamber could be compressed so as to form a stack which could then be ejected from the chamber when the rear wall was opened.

A number of other prior art patents were cited, particularly the DePuy machine and the Lundahl prototype from which Garrison and Lundahl worked in order to perfect the vertical compression as well as pickup, elevation, even distribution, compaction and discharge.

*McCullough Tool Co. v. Well Surveys, Inc.*, 343 F.2d 381 (10th Cir. 1965), *cert. denied*, 383 U.S. 933, 86 S.Ct. 1061, 15 L.Ed. 2d 851 (1966), articulated a somewhat liberal test governing an aggregation of old parts so as to produce a patentable invention. The opinion said:

The test of whether a particular patent is a mere aggregation and invalid or a combination and valid has been variously stated. Generally, where elements old in the art are united in such a way that a new and useful result is secured or an old result is attained in a more facile, economical and efficient manner, there is a patentable combination. *Bewal, Inc. v. Minnesota Mining and Mfg. Co.*, 10 Cir., 292 F.2d 159; *Oliver United Filters v. Silver*, 10 Cir., 206 F.2d 658, cert. denied, 346 U.S. 923, 74 S.Ct. 308, 98 L.Ed. 416.

343 F.2d at 393.

It is noteworthy that this court also said, just prior to the above quote, that:

It is universally held that a mere aggregation of a number of old parts or elements which, in the aggregation, perform or produce no new or different function or operation than previously performed or produced by them, is not a patentable invention. *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162; *Admiral Corporation v. Zenith Radio Corp.*, 10 Cir., 296 F.2d 708; *Consolidated Electro. Corp. v. Midwestern Instruments*, 10 Cir., 260 F.2d 811.

343 F.2d at 393.

■ It would appear that the Supreme Court has recognized in *Dann v. Johnston*, 425 U.S. 219, 96 S.Ct. 1393, 47 L.Ed.2d 692 (1976), that commercial success and failure of others may be relevant in determining obviousness or nonobviousness. However, the Supreme Court in *Dann v. Johnston, supra; Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976); and *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), also emphasized that commercial success without invention does not suffice. In *Sakraida*, the invention, a system to flush cow manure from barn floors, was held to be obvious. In *Dann v. Johnston, supra*, a computer system which provided recordkeeping for bank checks and deposits coded into categories by the bank customer was not patentable because it was obvious. The point was also made in *Sakraida* that in order for the combination of old elements to prevail, there must be a synergistic effect, that is, an effect greater than the sum of the several effects taken separately. The trial court was mindful of the Supreme Court's admonition in *Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., supra*, that courts should scrutinize a combination of patent claims with care proportioned to the difficulty and improbability of finding an invention in an assembly of old elements.

The patent is supposed to add to the sum of useful knowledge, the Supreme Court said, and patents are not to be sustained when their effect is to subtract from former resources freely available to skilled artisans. The trial court was cognizant of this in determining whether the differences were obvious to one reasonably skilled in the art, pointing out that one who makes such an invention is charged with awareness of the existing technology.

■ The trial court was not incorrect, as we view it, in its holding that the Hesston Patents did not achieve a synergistic result that would be nonobvious to one reasonably skilled in the art. On the contrary, the court concluded that Hesston's Patents demonstrated the work of a skilled mechanic, the difference being that these patents do not achieve a nonobvious patentable difference from the prior art since they have combined old elements which continue to function as they did previously. The old elements do not in combination perform a new and different function even though the wagons did succeed in producing a striking result by combining the old elements.

In our view, the strongest point in Hesston's case rests in its contention that a new and different result, which realized great commercial success, flowed from the combination of the old elements and that this overcomes the argument that the result was invalid for obviousness. Nevertheless, we must disagree with Hesston's position. It is our conclusion, as indicated above, that the trial judge correctly appraised the prior art and the combination in the light of the commercial success of the patents.

The issue in question has given us pause and concern, but we are in a less favorable position than was the trial court in terms of making the present evaluations.

The other issues determined by the trial court, which we have described in detail, fraud on the Patent Office and prior sale or use under § 102(b), are supported by the evidence. Although we have examined them for possible plain error, none is perceived.

■ One further matter which we deem it necessary to consider is whether the trial court erred, as Deere contends, in denying the request for lawyers' fees. Here again, our disposition is to accept the finding and conclusion of the trial court, which was not convinced that this was an extraordinary case, whereby Deere would be entitled to fees. After all, Hesston was the patentee in this case and it surely had the right to litigate without being assessed Deere's attorneys' fees, in the absence of any extraordinary actions, like fraud, by Hesston.

The judgment of the district court is affirmed.

## APPENDIX I

The Hesston Corporation, of Hesston, Kansas, is a rapidly growing corporation which primarily manufactures farming and industrial equipment. In the past ten years it has grown nearly tenfold. In fiscal 1966, Hesston reported net sales of $25,466,000, a net income of $1,148,000, and total assets of $13,440,000. In fiscal 1975, it reported net sales of $207,857,000, a net income of $9,572,000, and assets totaling $161,641,000. In the same period the number of persons it employed rose from an average of 1,050 to an average of 4,581.

By way of comparison, in fiscal 1975 Deere & Company reported net sales of $2,955,204,000, a net income of $179,073,000 and total assets listed at $2,440,829,000. At the close of 1975 Deere had 53,794 employees.

Both companies produce a wide range of products in general categories which include farm equipment, industrial equipment, and office and consumer products. Both operate in the United States and abroad. As an example of the level of diversity of these two corporations, Deere makes machines ranging from snowmobiles and lawn tractors to heavy duty graders,

large tractors, and combines. Hesston also has a wide range of products. It makes, *inter alia*, back-hoes, waste disposal units (compactors, incinerators, etc.), snowblowers, harvestors, office furnishings, and of course, windrowers and stack forming machines.

Hesston's largest division is farm equipment which, in 1975, accounted for 96% of Hesston's net sales. The hay stacking machines here at issue fall into this category. The hay handling equipment product line, in 1975, produced 37% of Hesston's net sales. This 37% is a figure which rose from 16% in 1971. Hesston's second leading product line consists of windrowing machines, which, in 1975, accounted for 24% of Hesston's net sales.

Hesston is a corporation of global scope. It operates plants in France and Italy, has licensees in Australia, Argentina, and Brazil, and distributors throughout the world.

## APPENDIX II

## OPERATION OF THE LUNDAHL AND GARRISON MACHINES

*The Lundahl Machine.*

In this design, two parts, a loader and a compressing wagon, comprise the machine. The loader loads the hay from the windrow by a rotary pickup unit which has tynes or fingers rotating on a horizontal axis. This unit delivers the hay to an "endless" conveyor belt which elevates the crop. Neither aspect is particularly novel and the applicant notes this by providing that these elements may be powered in any suitable fashion.

The elevator unit consists of two parallel endless chains connected by cross slats. This unit inclines up toward the conveyor assembly which extends horizontally rearwards, from the elevator, and is located over the chamber in which the hay is to be dropped. An endless belt which runs up the elevator and over the conveyor actually carries the crop. At the back end of the conveyor is a roller which moves longitudinally back and forth and serves to disperse the hay to the front and rear of the chamber body.

The elevator/loader housing and the main body are connected in a pivotal fashion allowing the body to be shifted from side to side without shifting the loader. This allows the hay to be dispersed from side to side in the wagon as the wagon is shifted. (This pivotal mechanism also permits better operation over uneven terrain by allowing the unit to twist on a longitudinal axis so that while the loader cants to the left the body lists to the right, and vice versa.)

The compression is achieved by the swingable gates, and tuckers attached thereto, which are a part of the main body. In the loading stage each gate is set in an upward position, as an extension of the side of the body, and aids in channeling hay from the conveyor into the body.

In the compression stage, the gates swing in and down, compressing the hay towards the floor. The tuckers add pressure to the hay near the walls. The resulting stack is packed and rounded on the top thus having the desirable quality of readily shedding moisture.

In unloading, the loader/elevator housing and the main body can be separated. This allows the operator to tow only the body to the unloading area. Offloading is accomplished by tilting the body down so that the rear rests on or near the ground, opening the tail gate, and pushing the stack by means of the false front.

*The Garrison Machine.*

In this machine the loading component is again housed at the front of the body. The crop is picked up by a drum rotating on a horizontal axis. The drum has projecting tynes which actually pick up the crop. The hay is then delivered to another rotating drum, placed superjacent to the pickup drum, which has retractable fingers which carry the crop. This latter device delivers

the hay into the path of a fan. The fan, housed in a duct, blows the hay upward. The hay, channeled by the duct housing, is directed up and then back into the wagon.

The loading system moves laterally back and forth at all times during the loading thus causing the crop to be dispersed from side to side in the wagon. At the outlet of the duct is a deflector plate which the operator may cause to swing up and down, as the blower swings back and forth, allowing the hay to be distributed to the front and back of the receiving body. These two oscillating elements are calculated to produce even distribution of the crop in the body.

The body has, as an integral part, a press. The press consists of a pitched roof (one that slopes down from both sides of the longitudinal center line), sides, and a rear wall which also functions as a gate. When the press is raised, the body and the press form a closed chamber into which the hay is blown. When the chamber is full, i. e., when the hay reaches the blower outlet near the top and front of the body, the loading is halted and the press activated. The press descends vertically upon the mass of hay. This process is repeated until the wagon is full of pressed hay.

When the stack is ready to be offloaded, the press does not have to be raised as both the back wall of the main chamber and the back wall of the press open as gates. The gates are raised and the body tilted so that the rear rests on or near the ground. The wagon is pulled forward and, at the same time, the stack pushed back and out. This last maneuver is achieved by means of a push bar which is located at or near the front of the wagon, near the base, and runs from one side to the other. The bar is attached to chains which run the length of the body and, when engaged, pull the bar towards the rear.

## APPENDIX III

### DIAGRAMS OF THE LUNDAHL AND GARRISON MACHINES

Figures one and two portray the Lundahl machine in the compression stages. The view is from the rear. In figure one the side gates are swinging down to press the hay. In figure two the gates are down and the manner in which the "tuckers" compress the crop near the side walls of the wagon is shown.

Figures three and four are side depictions of the Garrison machine. In figure three the press is raised for loading. In figure four the press has been lowered to form the stack.

Figure five shows the Garrison machine from the rear, figure six the front. One can see, in figure five, the sloping characteristics of the press roof. In figure six the blower/elevator loading apparatus can be seen. The fashion in which the duct oscillates from side to side is also shown.

Illustrations to follow.

3,828,535

Fig. 1

Fig. 2

3,847,072

**Fig.** 3

**Fig.** 4

3,847,072

Fig. 5          Fig. 6